# STATE OF MICHIGAN

# COURT OF APPEALS

DOW CHEMICAL EMPLOYEES' CREDIT
UNION,

UNPUBLISHED
June 7, 2018

Plaintiff/Counter-Defendant-
Appellee,

v

No. 337117
Bay Circuit Court
LC No. 14-003311-CK

BRENDA GEILING,

Defendant/Counter-Plaintiff-
Appellant.

Before: GADOLA, P.J., and K. F. KELLY and RIORDAN, JJ.

PER CURIAM.

Defendant, proceeding *in propria persona*, appeals as of right a judgment awarding plaintiff $51,760.63 following a jury trial. The judgment resulted from a deficiency balance after the repossession and sale of a speedboat and trailer, which served as collateral for a loan that plaintiff had issued to defendant and on which defendant had defaulted. Defendant challenges a variety of matters spanning from pretrial to post-trial motions. We affirm.

## I. FACTUAL BACKGROUND

## A. THE LOAN SECURED BY THE BOAT

In July 2006, defendant's husband, Cal Geiling, purchased a 30-foot speedboat for $67,000. He made repairs and improvements on the boat, including upgrading the boat's motors with two high performance engines he purchased for $12,000 each. In 2007, Mr. Geiling attempted to sell the boat, listing it at $95,000. However, because the highest offer he received was $75,000, he ultimately chose not to sell. Defendant had the boat appraised in 2008 by two sources, James Svoboda and Paul Pangborn, both of whom testified at trial. According to Mr. Svoboda, he estimated the engines were worth $70,000 and that the specialty trailer was worth $10,000. Meanwhile, Mr. Pangborn appraised the boat at $94,580, and the trailer at $4,590.

On September 22, 2008, plaintiff agreed to extend two separate loans to defendant: one in the amount of $60,000, secured by a lien on the boat and trailer, and another in the amount of $27,593.21, secured by a lien on a 2008 Pontiac G8 sedan. The loan agreement required defendant to maintain current contact information with plaintiff and to obtain plaintiff's written

-1-

consent before making major changes to the boat. In February 2010, Defendant defaulted on her payments on the loan secured by the boat. In spite of extensive efforts to contact defendant regarding the default, plaintiff's loss prevention collector Julie Ann Morgrette testified that she was unable to contact or otherwise locate defendant.[1] In June 2010, however, a skip trace company hired by plaintiff's insurer located the boat at Wilson Motorsports, a marina owned by Andrew Wilson.

Mr. Wilson testified that Mr. Geiling had approached him in March 2010 seeking to sell the boat's motors. A purchase agreement dated March 3, 2010, reflects that Mr. Wilson agreed to purchase both motors with exhaust, drives, steering, and gimbles for $12,500, with a down payment of $7,500 and the remaining balance to be applied to a $5,000 debt owed by Mr. Geiling to Wilson Motorsports from a previous bill. Defendant, however, denied that Mr. Geiling either signed the March 3 agreement or asked Mr. Wilson or Wilson Motorsports to sell the boat or its motors. Wilson Motorsports, in turn, sold the engines and drivetrain to David Masud for $17,000. The boat's hull and trailer remained at Wilson Motorsports.

When Ms. Morgrette contacted Wilson Motorsports, she was informed that the marina held a lien on the boat and that plaintiff would have to pay approximately $2,700 in delinquent repair and storage fees in order to retrieve the boat. Plaintiff instead initiated a lawsuit in November 2010 against Wilson Motorsports to retrieve the boat (the "Wilson litigation"). When plaintiff learned that the engines and drivetrain had been sold to Mr. Masud, he was joined as a defendant in that litigation. Although the parties attempted to join defendant and Mr. Geiling in the litigation, all attempts to locate or serve them were unsuccessful. The litigation concluded when the parties reached a settlement in October 2012. According to the settlement agreement, plaintiff would receive possession of the boat and hull, as well as a sum of $5,000, from Wilson Motorsports. Plaintiff would also receive $20,000 in proceeds from Mr. Masud's insurer; from these funds, plaintiff would purchase the boat motors and drivetrain from Mr. Masud for $10,000. As a result of this litigation, plaintiff incurred approximately $14,000 in attorney fees, which were added to defendant's account balance.

Ms. Morgrette testified that, after plaintiff had acquired the boat and motors, she hired John Gorm, co-owner and service manager of Linwood Beach Marina, to make repairs to and sell the boat. Mr. Gorm testified that the boat was in "disheartening" condition when it was repossessed. The boat lacked engines, outdrives, propellers, and mechanical systems, and it had water, leaves, and debris in the hull. When Mr. Gorm eventually received the boat's engines, they were partially disassembled and were missing parts. Because the boat was a racing boat capable of high speeds, Mr. Gorm had to ensure that it was safe to operate, and he dedicated 50 hours of labor to repairing the boat. The cost of repairs totaled $8,683.16.

---

[1] According to plaintiff, defendant's whereabouts remained unknown until February 14, 2014, when she sent a letter to plaintiff claiming damages as a result of plaintiff's alleged disclosure of her Social Security number.

Once the boat was fully repaired and ready for sale in January 2012, Mr. Gorm testified that he advertised it on several websites and in his showroom.[2] Mr. Gorm further stated that while the boat had an original MSRP of $185,900 had it been sold brand new, its industry trade-in value would be just $46,800, and its retail value with a dealership warranty would be $70,340. Mr. Gorm initially listed the boat at $90,000. However, after being on the market for a year, the boat had still not sold. Mr. Gorm testified that he had difficulties selling the boat for a number of reasons, including its history of repossession and extensive repairs. Accordingly, the list price was lowered over time.

After being on the market for approximately two years, the boat was ultimately sold in June 2014 for $41,600 to Sally Town. Unbeknownst to Linwood Marina or to plaintiff at the time of sale, Ms. Town was the mother-in-law of Mr. Masud and had purchased the boat on his behalf. Mr. Masud testified that, in light of his involvement in the previous litigation, he decided to make an offer using Ms. Town as a "straw buyer" because he believed that if plaintiff knew of his involvement, plaintiff would increase the price or refuse to deal with him.

Testimony offered by Nick Eisentraut, an employee of plaintiff familiar with defendant's account, established that a sum of $35,000 in net proceeds from the sale of the boat was applied to defendant's balance, resulting in a payoff balance of $22,343.70. An additional $10,830.12 in repairs and $14,062.95 in court-ordered legal fees from the Wilson litigation raised defendant's balance to $47,236.77. Mr. Eisentraut testified that as of July 2, 2014, defendant's deficiency, including interest, was $49,585.

## B. THE LOAN SECURED BY THE CAR

As indicated above, in September 2008, plaintiff extended a second loan to defendant in the amount of $27,593.21, secured by a lien on a 2008 Pontiac G8 sedan. Defendant defaulted on payment of this loan in March 2010. As previously described, during the period from February 2010 through February 2014, plaintiff was unable to locate or contact defendant. Plaintiff was also unable to locate the car for repossession, and consequently tendered the claim to its insurer, which paid a portion of the remaining loan obligation.

On April 18, 2013, the Clare County Sheriff informed plaintiff, as the first secured party, that the vehicle had been abandoned and taken into custody. On a condition report, the car was recorded as having collision damage, including scratches, dents, and chipped glass, as well as no battery. Plaintiff redeemed the car and, on May 23, 2013, sent defendant notice at her last known address of its intention to sell it at a public sale. The car was sold at auction on June 23, 2013, leaving an alleged deficiency balance of $227.

---

[2] After learning defendant's whereabouts, plaintiff personally served on defendant a demand letter and notice of intent to sell the boat on March 14, 2014.

## C. PROCEDURAL HISTORY

On May 16, 2014, plaintiff filed a two-count action against defendant seeking the deficiency owed on the loans secured by the boat (Count I) and by the car (Count II). Defendant, in turn, filed several counterclaims alleging that plaintiff had failed to dispose of the boat in a commercially reasonable manner, incurred unnecessary costs in litigation and repairs, breached the covenant of good faith and fair dealing, and violated the Social Security Number Privacy Act, MCL 445.81 *et seq.*, by disseminating unredacted versions of plaintiff's credit reports and loan application.

The trial court granted plaintiff's motion for summary disposition as to defendant's Social Security Number Privacy Act counterclaim. The parties also submitted cross-motions for summary disposition regarding the remainder of plaintiff's claims and defendant's counterclaims. However, plaintiff specified that, should the trial court decline to grant summary disposition with respect to its Count II claim regarding the deficiency on the loan secured by the car, it would prefer to voluntarily dismiss that claim. At the same time, defendant filed a motion seeking leave to amend her counterclaim in order to assert additional claims. The trial court denied defendant's motion for leave to amend on the basis of delay. It further denied the parties' cross-motions for summary disposition, finding there to be a question of fact with respect to the commercial reasonableness of the sale of the boat. However, it granted plaintiff's request to voluntarily dismiss Count II.

Following trial, the jury returned a verdict in favor of plaintiff, finding that plaintiff sold the boat in a commercially reasonable manner and that plaintiff was entitled to $49,585 in damages. Defendant moved for a new trial and for judgment notwithstanding the verdict, and the trial court denied these motions. The court entered an order of judgment against defendant in the amount of $51,760.63, which included the verdict and taxable costs.

## II. DISCUSSION

## A. EXHIBIT SUBMITTED ON APPEAL

As an initial matter, plaintiff contends that Exhibit C to defendant's brief on appeal was not part of the record before the trial court and therefore is not properly before this Court. Exhibit C is an excerpt of the Dow Chemical Employees' Credit Union Account Agreement & Disclosures and was not incorporated into the record before the trial court. It is a fundamental and well-established principle of appellate practice that " '[t]his Court's review is limited to the record established by the trial court, and a party may not expand the record on appeal.' " *In re Rudell Estate*, 286 Mich App 391, 405; 780 NW2d 884 (2009), quoting *Sherman v Sea Ray Boats, Inc*, 251 Mich App 41, 56; 649 NW2d 783 (2002). Accordingly, this Court declines to consider this exhibit.

## B. FAIRNESS OF TRIAL

## 1. JUROR BIAS

Defendant first contends that the trial court abused its discretion by denying her motion for a new trial based on evidence discovered after trial that a juror failed to disclose her relatives'

employment at Dow Chemical Company. We disagree. In accordance with MCR 2.611(A)(1)(b), a motion for a new trial may be premised on juror bias or misconduct. We review a trial court's decision to deny a motion for a new trial based on juror bias for an abuse of discretion. *Froede v Holland Ladder & Mfg Co*, 207 Mich App 127, 130; 523 NW2d 849 (1994); see also *Bynum v ESAB Group, Inc*, 467 Mich 280, 283; 651 NW2d 383 (2002). A trial court abuses its discretion when it "chooses an outcome falling outside the range of principled outcomes." *Edry v Adelman*, 486 Mich 634, 639; 786 NW2d 567 (2010).

Civil litigants have the right to trial before a fair and impartial jury unless the parties waive that right. Const 1963, Art 1, § 14. A juror is presumed to be qualified and competent to serve, and the burden is on the challenging party to establish otherwise. *Froede*, 207 Mich App at 130. To rebut this presumption, the challenging party must establish that (1) the juror would have been excused for cause, (2) the juror would have been otherwise dismissed, or (3) the party was actually prejudiced. *Id*.

Defendant maintains that the juror in question would have been dismissed for cause based on the fact that three members of her immediate family are current or former employees of Dow Chemical Company. A prospective juror may be excused for cause if the juror "is related within the ninth degree (civil law) of consanguinity or affinity to one of the parties or attorneys[.]" MCR 2.511(D)(8). Defendant's argument presumes that Dow Chemical Company and plaintiff, Dow Chemical Employees' Credit Union, are related companies. However, there is no indication in the record that these two corporate entities are related. That employees of Dow Chemical Company are merely *eligible* to become members of Dow Chemical Employees' Credit Union does not establish any meaningful connection. Defendant has not demonstrated that the juror's relations are, in fact, members of the credit union. As the party seeking reversal on appeal, defendant is responsible for providing this Court with a factual basis for her argument. *Petraszewsky v Keeth*, 201 Mich App 535, 540; 506 NW2d 890 (1993). Because defendant has failed to provide a factual basis demonstrating a meaningful connection between the juror and plaintiff, she has not met her burden to establish that the juror should have been excused for cause.

Next, defendant contends that, had the juror truthfully disclosed her relatives' connections with Dow Chemical Company, she would have peremptorily challenged that juror. "It is indispensable to a fair trial that a litigant be given a reasonable opportunity to ascertain on the voir dire whether any of the jurors summoned are subject to being challenged for cause or even peremptorily." *Fedorinchik v Stewart*, 289 Mich 436, 438-439; 286 NW 673 (1939). To this end, a juror must answer questions truthfully. *Froede*, 207 Mich App at 140. However, a false statement, standing alone, is an insufficient basis on which to set aside a jury's verdict. *Id*. Rather, " '[t]here must either be a showing of actual prejudice or it must be established . . . that the moving party would have successfully challenged for cause or otherwise dismissed the juror in question had the truth been revealed prior to trial.' " *Gustafson v Morrison*, 57 Mich App 655, 664; 226 NW2d 681 (1975), quoting *Citizens Commercial & Savings Bank v Engberg*, 15 Mich App 438, 440; 166 NW2d 661 (1968) (citations omitted).

The record does not support defendant's position that the juror in question gave false answers to any questions during voir dire or otherwise prevented defendant from reasonably deciding whether to exercise a peremptory challenge. During voir dire, defendant questioned the

jury members regarding any relationship they might have with any person or entity represented on the witness list, including Wilson Motorsports, Linwood Beach Marina, Mr. Masud, or Home Builders Association. Notably, defendant did not specifically ask the jury members whether they had any relationship with Dow Chemical Company. The juror in question thus did not make a false statement or fail to disclose any relationships, and defendant may not fault the juror for failing to answer a question that defendant did not ask. Diligence during voir dire extends to making "a careful inquiry of a prospective juror under oath." *Id*. at 663, citing *Clemmons v Super Food Services, Inc*, 3 Mich App 377; 142 NW2d 491 (1966). By neglecting to question the jury members regarding any relations to Dow Chemical Company or affiliated entities, defendant failed to exercise due diligence. Accordingly, that the juror did not disclose familial ties to Dow Chemical Company does not provide a sufficient basis to set aside the verdict.

Finally, defendant has neither argued that she was actually prejudiced nor established any indications of actual prejudice such that she was denied an impartial jury. See *People v Miller*, 482 Mich 540, 548-549; 759 NW2d 850 (2008) ("A juror's failure to disclose information that the juror should have disclosed is only prejudicial if it denied the defendant an impartial jury."). For these reasons, we reject defendant's argument that the jury selection in this case deprived her of a fair trial.

## 2. ATTORNEY MISCONDUCT

Defendant maintains that she was deprived of her right to a fair trial due to certain misconduct allegedly exhibited by plaintiff's attorneys. We disagree. Generally, "[t]he 'no objection—no ruling—no error presented' rule requires counsel to seek to have error cured before the case is submitted to the jury," unless the conduct could not have been cured. *Reetz v Kinsman Marine Transit Co*, 416 Mich 97, 101-102; 330 NW2d 638 (1982). In this case, defendant did not object to the conduct of plaintiff's counsel during trial and instead raised the issues for the first time after the jury had rendered its verdict in her motion for a new trial. The trial court denied defendant's motion for a new trial with respect to the alleged misconduct. This Court typically reviews for an abuse of discretion the trial court's decision on a motion for a new trial on the basis of attorney misconduct. *Veltman v Detroit Edison Co*, 261 Mich App 685, 688; 683 NW2d 707 (2004). However, in civil cases where a party has not preserved the issue through a timely request for a curative instruction, the following standard applies:

> When reviewing an appeal asserting improper conduct of an attorney, the appellate court should first determine whether or not the claimed error was in fact error and, if so, whether it was harmless. If the claimed error was not harmless, the court must then ask if the error was properly preserved by objection and request for instruction or motion for mistrial. If the error is so preserved, then there is a right to appellate review; if not, the court must still make one further inquiry. It must decide whether a new trial should nevertheless be ordered because what occurred may have caused the result or played too large a part and may have denied a party a fair trial. If the court cannot say that the result was not affected, then a new trial may be granted. [*Reetz*, 416 Mich at 102-103.]

It is well-established that "parties are entitled to a fair trial on the merits of the case, uninfluenced by appeals to passion or prejudice." *Layton v Cregan & Mallory Co*, 269 Mich

574, 583; 257 NW 888 (1934). Pervasive attorney misconduct may deprive a party of a fair trial, *Badalamenti v William Beaumont Hosp-Troy*, 237 Mich App 278, 289-290; 602 NW2d 854 (1999), and a trial court may grant a new trial pursuant to MCR 2.611(A)(1)(b) if the prevailing party committed misconduct affecting the moving party's substantial rights. Counsel commits misconduct when he engages in attempts "to inflame or prejudice the jury, based upon facts not in the case . . . ." *Firchau v Foster*, 371 Mich 75, 78; 123 NW2d 151 (1963).

First, defendant challenges the following comments made by plaintiff's counsel during voir dire describing the structure of a credit union as distinguished from a bank:

> The credit union is where people come together, pool their money, and make loans essentially to one another, and it's – it's not a for-profit.
>
> * * *
>
> The profits are – are fed back, if you will, to the members in terms of maybe lower interest rates, dividends, whatever the case may be. Whereas a bank – a millionaire can buy a lot of stock in J.P. Morgan and he's got a bigger ownership interest than the person whose [sic] got only one share.
>
> A credit union is, each member has one share, and its members loaning to each other.

Additionally, defendant objects to statements made by plaintiff's counsel framing the lawsuit as an attempt collect the deficiency balance on behalf of the credit union members. Defendant argues that these comments represent improper attempts to garner juror sympathy. We disagree.

With respect to the statements made during voir dire differentiating the credit union from a bank, plaintiff's counsel was presumably attempting to assess juror prejudice against banks and to clarify the distinction. In fact, plaintiff's attorney prefaced his remarks by asking the jury members if they understood the difference, and one of the jurors initially supplied that credit unions are member-owned while banks are not. These remarks, as well as any comments that plaintiff sought to recover the deficiency on behalf of its members, merely represent factual statements and do not constitute improper efforts to inflame or appeal to juror sympathies. Cf. *Reetz*, 416 Mich at 111 (holding that comments stressing a party's wealth or corporate status are improper).

Further, reversal is not appropriate when a party fails to make a timely objection and any prejudice could have been resolved by a curative instruction. *Id*. at 105. Immediate instruction by the court may cure most improper remarks, unless those remarks are severe or numerous. *Id*. at 106, 111. Defendant did not object to counsel's statements at the time they were made, and the trial court was thus unable to issue an immediate instruction to alleviate any perceived prejudice. There is no indication that the remarks were so severe or pervasive that a tailored instruction could not have cured them. Moreover, even without an objection, the trial court instructed the jury that sympathy for either party should not influence its decision, and this Court presumes that juries follow their instructions. See *Mich Dep't of Transp v Haggerty Corridor Partners Ltd Partnership*, 473 Mich 124, 178-179; 700 NW2d 380 (2005). Thus, counsel's remarks do not warrant reversal.

Second, defendant argues that, during closing argument, plaintiff's counsel made inflammatory statements and improperly accused defendant of lying. Specifically, defendant objects to the following statements:

> I don't know if you've heard the term "Hutzpah." Hutzpah probably nails exactly what's going on here. Hutzpah is defined as the boy that kills his parents and then begs the Court for mercy because he's an orphan, and that's what we've got here, really.

Plaintiff's counsel then expressed skepticism at defendant's version of events – that she stored the boat with Wilson Motorsports in January 2010 and that Mr. Wilson thereafter sold the boat's engines without defendant's knowledge or consent, forging the March 3, 2010 sales agreement with Mr. Geiling. Plaintiff's counsel highlighted certain inconsistencies between defendant's version of events and other pieces of evidence, arguing that her story "doesn't make a lick of sense." Rather, plaintiff's counsel maintained that the evidence demonstrated defendant's intent to default on the loan and "part out" the boat for what money she could obtain. Plaintiff's counsel concluded:

> Her story—Her—I submit, her testimony in this case is just flat out not cre—it's a lie. It's a lie. I'm just going to call it that. I'm not going to say, not credible. She was lying when—with the stuff she's telling you about what happened with the boat.

Attorneys may, in their discretion, " 'discuss the character of witnesses, the probability of the truth of testimony given on the stand, and may, when there is any reasonable basis for it, characterize testimony.' " *Reetz*, 416 Mich at 108 n 21, quoting *Smith v. Jennings*, 121 Mich 393, 397; 80 NW 236 (1899). Additionally, an attorney may argue that a witness's testimony was fabricated when contrary evidence has been presented. *Id*. at 109. Finally, it is not improper to point out that a party did not produce evidence in support of that party's position. *Id*. Viewed as a whole, counsel's arguments were proper, as they concerned the credibility and demeanor of defendant in the face of contradictory evidence. These statements were neither the continual "unsubstantiated insinuations" at issue in *Kern v St Luke's Hosp Ass'n of Saginaw*, 404 Mich 339, 352; 273 NW2d 75 (1978), nor the "unjustified, direct attacks" on witnesses' integrity at issue in *Wayne Co Bd of Rd Comm'rs v GLS Lease Co*, 394 Mich 126, 134; 229 NW2d 797 (1979). We therefore conclude that counsel did not commit misconduct during his closing argument.

Third, defendant argues that plaintiff's counsel acted inappropriately in front of the jury by rolling his eyes and shaking his head during defendant's testimony. We cannot conclude that misconduct occurred because defendant did not object to the alleged misconduct or make a contemporaneous record, and there is no evidence of inappropriate conduct in the record. See *Hilgendorf v St John Hosp & Med Ctr Corp*, 245 Mich App 670, 683; 630 NW2d 356 (2001) ("The cold record before us leaves no room to conclude that [defense counsel] committed any sort of misconduct, intentional or unintentional."). Defendant did not raise this issue until after the jury announced its verdict and the trial court polled the individual jurors. When the trial court then asked the parties if they had anything further for the record, defendant asserted that plaintiff's co-counsel had been making faces during her testimony. The trial court noted that it

had not noticed any such conduct, but ruled that it was too late for it to do anything about the alleged misconduct. Indeed, defendant may not harbor error as an appellate parachute when she was aware of, but failed to promptly address, the alleged misconduct at trial. See *id*. Therefore, reversal is not warranted.

## C. EVIDENTIARY ISSUES

Next, defendant contends that the trial court abused its discretion by admitting the deposition testimony of Mr. Geiling and by admitting the March 3, 2010 sales agreement between Mr. Geiling and Mr. Wilson. Defendant argues that both pieces of evidence were irrelevant and inadmissible hearsay.[3] Defendant also argues that the trial court erred by excluding her proffered ABOS Marine Blue Book valuation document. We disagree with each of defendant's arguments.

We review a trial court's evidentiary rulings for an abuse of discretion. *Edry*, 486 Mich at 639. A court abuses its discretion when it "chooses an outcome falling outside the range of principled outcomes." *Id*. We review de novo preliminary questions of law surrounding the admission of evidence, such as whether a rule of evidence bars admitting it. *Dep't of Transp v Frankenlust Lutheran Congregation*, 269 Mich App 570, 575; 711 NW2d 453 (2006).

We first turn to the trial court's admission of Mr. Geiling's deposition testimony. Hearsay is "a statement, other than the one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." MRE 801(c). Hearsay is inadmissible, unless it is subject to a hearsay exception. MRE 802. Deposition testimony is generally considered inadmissible hearsay. *Lombardo v Lombardo*, 202 Mich App 151, 154; 507 NW2d 788 (1993). However, if a declarant is unavailable to testify[4] as a witness at trial, MRE 804(b)(5) allows the trial court to admit

> [t]estimony given as a witness in a deposition taken in compliance with law in the course of the same or another proceeding, if the party against whom the testimony is now offered, or, in a civil action or proceeding, a predecessor in interest, had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination.

---

[3] Defendant also argues in her reply brief that the deposition testimony should have been excluded under MRE 403 because it was more prejudicial than probative. We decline to address this issue. Defendant did not make such an objection at trial, and a reply brief is not the proper medium to first argue an issue on appeal. MCR 7.212(G); *Blazer Foods, Inc v Restaurant Props, Inc*, 259 Mich App 241, 252; 673 NW2d 805 (2003).

[4] A declarant is unavailable if he or she is exempted from testifying on the basis of privilege. MRE 804(a)(1). Mr. Geiling was unavailable to testify because defendant asserted spousal privilege.

The deposition testimony introduced at trial was taken during the course of litigation between Mr. Geiling and Secord Lake Marina regarding the boat. While Secord sought to recover payment for services rendered installing the upgraded boat engines, Mr. Geiling claimed dissatisfaction with Secord's work. As a result of Secord's allegedly poor workmanship, Mr. Geiling claimed that he incurred additional costs in correcting the defects and that he was unable to sell the boat at its true value. In light of the nature of the suit and Mr. Geiling's position that the boat was worth more than he was able to sell it for, it was in his interest to demonstrate through his own testimony a high valuation of the boat. Likewise, in the present case, defendant maintained that plaintiff did not dispose of the boat in a commercially reasonable manner, as evidenced by her position that the boat's value was much greater than the sale price. It was therefore also in her interest to demonstrate a high valuation of the boat. Accordingly, as Mr. Geiling was defendant's predecessor in interest, the hearsay exception set forth in MRE 804(b)(5) applies.

Defendant also contends that Mr. Geiling's testimony regarding the boat's value in 2007 was not relevant to its value when it was sold. We disagree. Evidence is relevant when it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *Haggerty Corridor*, 473 Mich at 138; see also MRE 401. A fact of consequence is a fact that "is within the range of litigated matters in the controversy." *Morales v State Farm Mut Auto Ins Co*, 279 Mich App 720, 731; 761 NW2d 454 (2008). The boat's value was of central importance in this case. Defendant disputed that plaintiff failed to dispose of the boat in a commercially reasonable manner on the ground that the boat was worth more than the amount received in the sale. Thus, Mr. Geiling's testimony regarding the historical value of the boat, including the fact that he attempted to sell the boat for $95,000, would tend to have a bearing on the likelihood of the commercial reasonableness of the sale. Indeed, this testimony tended to prove that Mr. Gorm's decision to list the boat initially for $90,000 was reasonable. For these reasons, the trial court's decision to admit Mr. Geiling's deposition testimony did not fall outside the range of principled outcomes.

Second, we turn to the trial court's admission of the March 3, 2010 sales agreement between Mr. Geiling and Mr. Wilson. Defendant maintains that the agreement was improperly admitted because it was unauthenticated, irrelevant, and prejudicial. These arguments are without merit. The duplicate of the sales agreement was authenticated through the testimony of Mr. Wilson, a party to the agreement, and defendant has offered no evidence raising a genuine question as to the authenticity of the document. Next, defendant failed to object to the relevance of the sales agreement at trial and thus has failed to preserve this issue for appellate review. However, defendant's argument is unavailing even on its merits, as the sales agreement concerns the sale of the boat's engines, a significant aspect of the boat's history that would impact its value. As previously discussed, the boat's value was relevant to whether the boat's ultimate sale was commercially reasonable. Finally, because defendant also failed to object to the prejudicial effect of the sales agreement during trial, she has failed to preserve this issue for appellate review. In any event, introduction of the sales agreement was not prejudicial because Mr. Wilson had previously testified regarding the sale of the boat's engines.

Third, we turn to the trial court's decision to exclude from evidence the ABOS Marine Blue Book valuation submitted by defendant at two points during trial.[5] Initially, during the testimony of Mr. Svoboda, the appraiser who surveyed the boat in 2008, defendant sought to introduce the ABOS valuation, which she "did online, putting in adjustments." Plaintiff objected on the basis of foundation, arguing that defendant had entered adjustments without knowledge of whether those adjustments were present when the boat was sold. Mr. Svoboda agreed he had no knowledge of the boat's condition when it was sold in 2014 and therefore could not verify the adjustments. The trial court sustained plaintiff's objection, determining that defendant had not established a foundation for admitting the exhibit.

Defendant again sought to admit the ABOS valuation during Mr. Wilson's testimony. Plaintiff made similar objections as to foundation and relevance because Mr. Wilson was unfamiliar with the boat's condition and features in 2014, after it had been reassembled by Mr. Gorm. Indeed, it was established that the last time Mr. Wilson had seen the boat assembled was in 2010. Further, Mr. Wilson's testimony revealed that the ABOS valuation incorporated adjustments for features not included on the boat in 2010. Thus, the trial court again ruled the ABOS document was inadmissible for lack of foundation.

Generally, MRE 901 requires a proponent of evidence to provide "evidence sufficient to support a finding that the matter in question is what the proponent claims." MRE 901(b); *Edry*, 486 Mich at 639. In both instances in which defendant sought to admit the ABOS valuation, neither of the witnesses could verify that the proposed exhibit accurately reflected the boat's condition either in 2010 or in 2014. Defendant thus failed to establish that the ABOS valuation was based on the actual condition of the boat such that it could be considered a reliable estimate of the boat's value.

For these reasons, we reject defendant's arguments that the trial court's evidentiary determinations fell outside the range of reasonable and principled outcomes.

## D. DEFENDANT'S MOTION TO AMEND

Defendant argues that the trial court erred by denying her second motion to amend her counterclaim on the basis of delay. We disagree. "This Court reviews for an abuse of discretion a trial court's denial of a motion to amend a complaint." *Tierney v Univ of Mich Regents*, 257 Mich App 681, 687-688; 669 NW2d 575 (2003), citing *Jenks v Brown*, 219 Mich App 415, 420; 557 NW2d 114 (1996). The trial court abuses its discretion when its decision is outside the range of principled outcomes. *In re Kostin*, 278 Mich App 47, 51; 748 NW2d 583 (2008).

When a party moves for leave to amend a complaint, "[l]eave shall be freely given when justice so requires." MCR 2.118(A)(2). The trial court may deny a party's request for leave to amend the complaint only if one of the following particularized reasons applies: (1) undue delay,

---

[5] Defendant appears to argue on appeal that the ABOS valuation was self-authenticating. However, because the trial court rejected this evidence on the grounds of foundation and relevance only, this Court will not address the issue of authenticity.

(2) bad faith, (3) dilatory motive, (4) repeated failure to cure deficiencies, (5) undue prejudice to the opposing party, or (6) futility of the amendment. *Tierney*, 257 Mich App at 687-688. Although delay alone does not justify denial of a motion to amend, denial may be warranted if the delay was undertaken in bad faith or would result in prejudice to the opposing party. *Weymers v Khera*, 454 Mich 639, 659; 563 NW2d 647 (1997). Prejudice may exist under circumstances where

> the moving party seeks to add a new claim or a new theory of recovery on the basis of the same set of facts, after discovery is closed, just before trial, and the opposing party shows that he did not have reasonable notice, from any source, that the moving party would rely on the new claim or theory at trial. [*Id.* at 659-660.]

Indeed, "the longer an amendment is delayed, the greater the risk of substantial prejudice." *Stanke v State Farm Mut Auto Ins Co*, 200 Mich App 307, 321; 503 NW2d 758 (1993), citing *Ben P Fyke & Sons v Gunter Co*, 390 Mich 649, 656; 213 NW2d 134 (1973).

In August 2016, defendant filed a motion seeking leave to file an amended counterclaim. The proposed amendments included allegations that plaintiff had breached the peace while repossessing the car; that plaintiffs had provided inadequate notice regarding repossession and sale of both the boat and the car; and that plaintiffs failed to respond to requests for an accounting with respect to the public sale of the car. The trial court denied defendant's motion to amend on the basis that it was the product of undue delay, as the underlying facts were known to defendant years before she filed her motion.

On appeal, defendant contends that the trial court erred because delay alone cannot justify denial of a motion seeking leave to amend. Defendant's position lacks merit. Defendant would have been aware that plaintiff's agent allegedly breached the peace when an effort was made to repossess the vehicle in April 2013; however, she did not attempt to amend her counterclaims until September 2016, more than three years later. Defendant also would have been aware of plaintiff's alleged failure to provide notice of the repossession and sale of the boat and the car, at the latest, from the inception of the litigation. Accepting as true defendant's claims that she submitted to plaintiff her first request for an accounting in November 2014, defendant admitted before the trial court that she would have been aware of the failure to comply within 14 days of this submission. Indeed, when the trial court commented, "You knew all those facts at the time though," defendant responded, "Well, I did, your Honor." Defendant's statements during the motion hearing directly contradict her assertions on appeal that these allegations were premised on evidence previously withheld by plaintiff and only uncovered during discovery.

Moreover, permitting defendant to amend her complaint would have resulted in significant prejudice to plaintiff. At the time defendant filed her motion to amend, trial was scheduled to begin within three months, and the parties had already completed the overwhelming majority of discovery. Nonetheless, at this late stage in the litigation, defendant sought to introduce entirely new counterclaims and theories premised on facts known to her long before that would require plaintiff to formulate additional defenses with only minimal discovery remaining. Accordingly, the trial court's decision to deny plaintiff's motion on the basis of undue delay did not fall outside the range of principled outcomes.

-12-

E.  MOTIONS FOR SUMMARY DISPOSITION AND JUDGMENT NOTWITHSTANDING THE VERDICT

Defendant argues that the trial court misapplied the Uniform Commercial Code (UCC) in deciding the parties' cross motions for summary disposition and in deciding defendant's motion for judgment notwithstanding the verdict.  Defendant's arguments fail because the trial court's legal determinations were sound and because the jury's factual findings were supported by sufficient evidence.

We review challenges to a trial court's grant or denial of summary disposition de novo. *Johnson v Recca*, 492 Mich 169, 173; 821 NWd 520 (2012).  A motion for summary disposition under MCR 2.116(C)(10) tests the factual sufficiency of the claims.  *Joseph v Auto Club Ins Ass'n*, 491 Mich 200, 206; 815 NW2d 412 (2012).  "In evaluating a motion for summary disposition brought under this subsection, a trial court considers affidavits, pleadings, depositions, admissions, and other evidence submitted by the parties . . . in the light most favorable to the party opposing the motion." *Maiden v Rozwood*, 461 Mich 109, 120; 597 NW2d 817 (1999).  A party is entitled to summary disposition as a matter of law when the evidence fails to establish a genuine issue of material fact remaining for trial.  *Id*.

This Court also reviews de novo a trial court's decision on a motion for judgment notwithstanding the verdict.  *Diamond v Witherspoon*, 265 Mich App 673, 681; 696 NW2d 770 (2005).  In determining a motion for judgment notwithstanding the verdict, trial courts are to apply the following standard:

> [t]he standard of review . . . requires review of the evidence and all legitimate inferences in the light most favorable to the nonmoving party. . . . Only if the evidence so viewed fails to establish a claim as a matter of law, should a motion for judgment notwithstanding the verdict be granted.  [*Orzel v Scott Drug*, 449 Mich 550, 557-558; 537 NW2d 208 (1995), citing *Wadsworth v New York Life Ins*, 349 Mich 240, 253-254; 84 NW2d 513 (1957) and *Schutte v Celotex Corp*, 196 Mich App 135, 138; 492 NW2d 773 (1992).]

If the evidence would permit reasonable jurors to reach different conclusions, the jury verdict must be upheld.  *Diamond*, 265 Mich App at 682.

1.  CLAIMS REGARDING THE CAR

Defendant contends that the trial court erred in denying summary disposition in her favor with respect to the claims and counterclaims involving the loan secured by the car.  Specifically, in arguing that the trial court failed to properly apply the UCC, defendant maintains that plaintiff supplied inadequate notice of the car's sale, that the sale was not commercially reasonable, and that plaintiff misapplied the proceeds of the sale.  With respect to summary disposition regarding defendant's counterclaims, the trial court correctly determined that defendant had brought no counterclaims relative to repossession of the car.  Although defendant sought leave to amend her counterclaim in order to assert such allegations, we have determined that this motion was properly denied.

With respect to defendant's challenge to the trial court's denial of defendant's motion seeking summary disposition of Count II of plaintiff's complaint, this matter is moot. Generally, this Court does not address matters that are moot. *King v Mich State Police Dep't*, 303 Mich App 162, 192; 841 NW2d 914 (2013). " 'An issue is moot if an event has occurred that renders it impossible for the court to grant relief. An issue is also moot when a judgment, if entered, cannot for any reason have a practical legal effect on the existing controversy.' " *Id.*, quoting *Gen Motors Corp v Dep't of Treasury*, 290 Mich App 355, 386; 803 NW2d 698 (2010). Here, the trial court ultimately granted plaintiff's request to dismiss with prejudice Count II of its complaint, thereby granting the relief sought in defendant's motion for summary disposition on this claim.

## 2. CLAIMS REGARDING THE BOAT

Defendant next contends that the trial court erred by failing to grant her motions for summary disposition and for judgment notwithstanding the verdict with respect to the parties' claims and counterclaims involving the loan secured by the boat.[6] Defendant challenges the determinations and factual findings regarding three primary issues concerning the sale of the boat: (1) the adequacy of the notice of the sale, (2) the commercial reasonableness of the sale, and (3) plaintiff's alleged damages. We conclude that defendant's arguments are without merit because she waived the argument challenging notice and because, viewing the evidence in the light most favorable to plaintiff, reasonable jurors could have concluded that the sale was commercially reasonable and that plaintiff proved its claimed damages.

### a. NOTICE

First, defendant argues that the notifications plaintiff furnished both before and after the sale of the boat were defective under the UCC because they inflated the amount owed and were mailed to the wrong address. We conclude that defendant waived this argument by failing to raise it at any point before the trial court. Our Supreme Court has held that "a litigant must preserve an issue for appellate review by raising it in the trial court." *Walters v Nadell*, 481 Mich 377, 387; 751 NW2d 431 (2008) (citations omitted). Failure to timely raise such an issue before the trial court results in waiver of that issue on appeal, though the Court has the authority

---

[6] On appeal, defendant does not advance any argument that the trial court erred at the summary disposition stage by determining that questions of fact existed. Rather, she simply reiterates the same arguments presented in her original briefing without acknowledging that plaintiff presented conflicting evidence, let alone articulating why that evidence was insufficient to sustain the trial court's finding that factual questions existed. Just as parties may not rely on this Court to search for authority in support of their position, *American Transmission, Inc v Attorney General*, 216 Mich App 119, 121; 548 NW2d 665 (1996), they also may not rely on the Court to develop arguments inadequately argued, *Severn v Sperry Corp*, 212 Mich App 406, 415; 538 NW2d 50 (1995). Accordingly, the Court declines to review the trial court's determination that factual issues existed. Nonetheless, as concluded above, far from failing to establish factual questions at the summary disposition stage, plaintiff presented sufficient evidence at trial for a reasonable juror to find in its favor.

to review the issue to prevent a miscarriage of justice. *Id*. Here, Defendant did not challenge the sufficiency of the notice with respect to the disposition of the boat in her answer or counterclaim, in her motion for summary disposition, or in her motion for judgment notwithstanding the verdict. Simply put, this precise issue was never advanced before the trial court, and was not at issue at trial. Indeed, the jury was not called upon to resolve any factual issue with respect to notice. Accordingly, we determine that the issue of notice is waived. Nonetheless, we also conclude that waiver does not result in a miscarriage of justice, as defendant conceded in her briefing that "[o]n March 14, 2014 the Credit Union . . . [personally] serv[ed] Geiling a Notice of Default and Sale Disposition in the Bay County Court Room . . . ." With respect to the alleged inflation of the amount owed, we conclude below that the amount of the debt was supported by sufficient evidence.

## b. COMMERCIAL REASONABLENESS

Second, defendant argues that the sale of the boat was not commercially reasonable for the following reasons: (1) the purchase price was unreasonable, (2) the advertisement was flawed, and (3) plaintiff inflated the debt by engaging in the Wilson litigation. We conclude that sufficient evidence existed permitting the jury to conclude that the sale was commercially reasonable with respect to each of these matters.

The UCC, MCL 440.1101 *et seq.*, generally governs the laws of commercial transactions, and Article 9 governs secured transactions. MCL 440.9101. Article 9 provides that, after a default, a secured party may "dispose of any or all of the collateral in its present condition or following any commercially reasonable preparation or processing." MCL 440.9610(1). Article 9 also gives the debtor rights during the disposition of the collateral. MCL 440.9601(4); *Fodale v Waste Mgt of Mich, Inc*, 271 Mich App 11, 22; 718 NW2d 827 (2006). Every aspect of the disposition must be commercially reasonable. MCL 440.9610(2). The UCC provides the following guidance on determining whether a disposition was commercially reasonable:

> (1) The fact that a greater amount could have been obtained by a collection, enforcement, disposition, or acceptance at a different time or in a different method from that selected by the secured party is not of itself sufficient to preclude the secured party from establishing that the collection, enforcement, disposition, or acceptance was made in a commercially reasonable manner.

> (2) A disposition of collateral is made in a commercially reasonable manner if the disposition is made in the usual manner on any recognized market, at the price current in any recognized market at the time of the disposition, or otherwise in conformity with reasonable commercial practices among dealers in the type of property that was the subject of the disposition. [MCL 440.9627.]

In a deficiency action, it is the secured party's burden to establish "that the collection, enforcement, disposition, or acceptance was conducted in accordance with" these provisions. MCL 440.9626(b).

Defendant contends that plaintiff failed to establish that the $41,600 purchase price of the boat was commercially reasonable, as she maintains the boat's value was much greater. She

further argues that, because plaintiff never sought an appraisal of the boat, plaintiff failed to establish the boat's true market value at trial. However, we conclude there was extensive testimony from which the jury could determine both the value of the boat and that the purchase price was commercially reasonable. At trial, Mr. Gorm testified that sellers' guidelines established that similar boats had a trade-in value of $46,800 and a dealership retail value of $70,340, if sold with a warranty. He also stated the boat's price would be lower because it had been repossessed and had reassembled engines. Similarly, Mr. Pangborn, who appraised the boat in 2008, testified that he appraised the boat at $94,580 and the trailer at $4,590. Mr. Svoboda, who also surveyed the boat in 2008, testified that the boat's value would depreciate between $5,000 and $7,000 per year.

In contrast, defendant stated at trial that when she had the boat appraised in 2008, it was worth $160,000. Mr. Gorm confirmed that a 2008 appraisal valued the boat at $150,000 and the trailer at $10,000. But in spite of this conflicting evidence, the jury could have chosen to credit Mr. Gorm's and Mr. Pangborn's estimations of the boat's value. Alternatively, the jury could have determined the boat's value in 2014 on the basis of Mr. Svoboda's testimony regarding depreciation. For these reasons, reasonable jurors could conclude that plaintiff established the boat's market value, and this Court will not disturb the jury's factual findings. See *Ellsworth v Hotel Corp of America*, 236 Mich App 185, 194; 600 NW2d 129 (1999), citing *King v Taylor Chrysler–Plymouth, Inc*, 184 Mich App 204, 217; 457 NW2d 42 (1990) ("The trial court cannot substitute its judgment for that of the factfinder, and the jury's verdict should not be set aside if there is competent evidence to support it.").

With respect to the purchase price of the boat, Mr. Gorm originally listed the boat at $90,000, which was consistent with Mr. Pangborn's appraisal in 2008, as well as with Mr. Geiling's asking price of $95,000 when he listed the boat for sale in 2007. After receiving no reasonable offers at this price, Mr. Gorm concluded "that 34,070 people [who viewed the advertisement] agreed that the price was too high," and consequently lowered the price to $64,995 and later to $59,900. Mr. Gorm stated that it is more difficult to sell repossessed boats because most buyers know that repossessed boats are "not very well taken care of." Additionally, Mr. Gorm was selling the boat without a warranty and had no information regarding the boat's history, including the number of owners, the number of times the engines had been rebuilt, or whether it had been a saltwater or freshwater boat. Mr. Gorm stated he received offers as low as $10,000 and $20,000, which he did not entertain. An offer for $50,000 fell through because that buyer could not obtain financing, while another offer for $45,000 resulted in no follow-up by the buyer. After two years on the market, the boat was finally sold to Sally Town for $41,600. In light of Mr. Gorm's testimony regarding the unsuccessful efforts to sell the boat over the course of two years and the lack of buyer interest due to the boat's history of repossession and lack of warranty, a reasonable jury could conclude that plaintiff's initial asking price of $90,000 and ultimate acceptance of $41,600 were commercially reasonable.

Regarding the reasonableness of the advertisement of the boat, Mr. Gorm testified extensively about his process of marketing and selling the boat. Mr. Gorm displayed the boat at his marina facility, which received thousands of visitors on weekends. Additionally, he explained that he has a "Web Pack" of major websites on which he advertises. One website reported the boat received 34,070 total views, with 1,858 people opening the advertisement and reviewing the information. Mr. Gorm stated that he received approximately a hundred calls

regarding the boat. He admitted that two of the advertisements erroneously listed the number of engines at zero but observed that the same advertisements later stated that the engines and outdrives had completely checked out. A subsequent advertisement indicated the boat had a total horsepower of 1400 and two GM 568 Bow Tie gas engines. Although Mr. Gorm also admitted that the engines were truly GM 572 models, he stated this was a four-inch discrepancy that would not likely deter interested buyers.

Defendant highlights testimony by Mr. Wilson indicating that he had never heard of 568 engines and that, in reading the advertisement, he would conclude "they didn't know what they're talking about." However, Mr. Wilson also stated that if he was searching for a boat, he would not limit his search to a specific type of engine and rather would see what was available. Though the record demonstrates conflicting evidence regarding the reasonableness of the advertisement, this conflict presents only a question of fact for the jury to resolve. See *Dawe*, 289 Mich App at 401. Accordingly, this Court again declines to substitute its own judgment for that of the factfinder. See *Ellsworth*, 236 Mich App at 194.

Next, defendant argues that plaintiff unreasonably permitted her loan balance to become inflated by engaging in the Wilson litigation. She maintains that, rather than incur $14,000 in litigation costs, plaintiff could have recovered the boat by paying the $2,700 marina lien demanded by Wilson Motorsports. We reject defendant's argument. Under the UCC, a secured party is entitled to deduct from the cash proceeds of a disposition "*the reasonable expenses of retaking*, holding, preparing for disposition, processing, and disposing, and, to the extent provided for by agreement and not prohibited by law, *reasonable attorney fees and legal expenses incurred by the secured party*. MCL 440.9615(1)(a) (emphasis added). During trial, Ms. Morgrette testified that plaintiff chose not to pay the $2,700 fee demanded by Wilson Motorsports because it had no knowledge that the boat was in an acceptable condition and because it was the legal property of plaintiff as the lienholder. Accordingly, Ms. Morgrette stated that plaintiff initiated the litigation in order to enforce its rightful ownership interest. Moreover, Ms. Morgrette explained that defendant was not joined as a party to this litigation because she could not be located, as discussed in detail above. In view of this testimony, we hold that a reasonable jury could have concluded that plaintiff acted reasonably when it initiated the Wilson litigation.

c. DAMAGES

Finally, defendant argues that plaintiff failed to establish its damages or properly apply credits to defendant's account. Regarding the application of credits, defendant specifically maintains that the $15,000 in proceeds obtained from settlement of the Wilson litigation should have been applied toward the $14,000 incurred in attorney fees from that case. We disagree.

After a foreclosure sale, the secured party must account to and pay the debtor any surplus, MCL 440.9615(4)(a), and the debtor is liable for any deficiency, MCL 440.9615(4)(b). During trial, Mr. Eisentraut testified extensively regarding the accounting applied to defendant's account. According to Mr. Eisentraut, on the day the boat was sold, defendant's account had a principal balance of $40,030.87, an interest balance of $16,072.15, and $1,240.68 in repossession and late fees, for a total amount owed of $62,343.70. He explained this amount reflected a credit of $15,000, applied at the time plaintiff received the settlement funds from the Wilson litigation.

Additionally, plaintiff received $35,000 in net proceeds on the boat, which were also applied to defendant's $40,030.87 principal balance. Mr. Eisentraut reported that after applying the proceeds of the boat sale, a payoff balance of $22,343.70 remained. This testimony was consistent with Ms. Morgrette's testimony that documents from the credit union after the boat sale reflected a principal balance of $40,030.87 and a deficiency balance, including repossession fees and interest, of $22,343.70.

In addition to the deficiency balance of $22,343.70, Mr. Eisentraut stated defendant owed $10,830.12 in repair expenses and $14,062.95 in court-ordered legal fees from the Wilson litigation. These fees raised defendant's total balance to $47,236.77. Mr. Eisentraut testified that, as of July 2, 2014, defendant's deficiency balance was $49,585, including interest. Viewing the evidence in the light most favorable to plaintiff, reasonable jurors could have concluded that plaintiff properly applied credits to defendant's account and that defendant owed a deficiency of $49,585.

Defendant contends that plaintiff failed to provide the jury with account statements in support of Mr. Eisentraut's testimony. We reject this argument. To establish its damages, plaintiff presented the testimony of Mr. Eisentraut, who stated he was familiar with defendant's account, including her payment history and loan balance. Plaintiff had no obligation to bolster its own witness' testimony by presenting cumulative evidence. Had Mr. Eisentraut's testimony been in any way inaccurate, plaintiff herself could have impeached his statements by introducing her account statements, to which she presumably had access.

To the extent defendant argues that plaintiff failed to produce certain records during discovery and that plaintiff committed fraud by altering a document, the Court declines to address these issues, as they were raised for the first time in her reply brief. See MCR 7.212(G); *Blazer Foods*, 259 Mich App at 252. In summary, the evidence presented was sufficient to sustain the jury's finding that plaintiff was entitled to $49,585, plus $2,175.63 in taxable costs.

### 3. ATTORNEY FEES

Defendant briefly argues that the trial court inappropriately granted summary disposition in favor of plaintiff with respect to plaintiff's entitlement to attorney fees incurred in the Wilson litigation. Defendant's argument lacks merit because the language of the loan agreement entitled plaintiff to recover attorney fees. This Court reviews de novo a trial court's ruling on a motion for summary disposition, as well as the interpretation and legal effect of contractual provisions. *DeFrain v State Farm Mut Auto Ins Co*, 491 Mich 359, 366-367; 817 NW2d 504 (2012). If no reasonable person could dispute the meaning of the contract's plain language, this Court must enforce that language as written. *Rory v Continental Ins Co*, 473 Mich 457, 468; 703 NW2d 23 (2005). If the contract's language is unambiguous, this Court interprets the contract as a matter of law. *Klapp v United Ins Group Agency, Inc*, 468 Mich 459, 469; 663 NW2d 447 (2003).

In this case, Mr. Eisentraut stated that $14,062.95 in attorney fees was added to defendant's balance as a result of the Wilson litigation. Pursuant to the loan agreement, defendant contractually agreed to "pay all costs, including but not limited to any attorney fees," incurred by plaintiff in protecting its security interest. The trial court held on summary disposition that, under this contractual language, plaintiff was entitled to attorney fees incurred

as a result of plaintiff's efforts to recover the boat in the Wilson litigation. The trial court did not err in so holding or by enforcing the unambiguous, plain language of the loan agreement. We therefore reject defendant's argument.

## 4. INTEREST

Defendant also briefly argues that plaintiff should be estopped from collecting interest on the debt balances because plaintiff charged off its losses for tax purposes. Defendant advanced this argument before the trial court but failed to support it. Defendant similarly fails to support this argument on appeal with either citations to the record to support her factual assertions or to binding precedent[7] supporting her legal assertions. The party seeking reversal on appeal has the burden to provide the court with a record that establishes the factual basis of his or her argument, *Petraszewsky*, 201 Mich App at 540, as well authority in support of her position, *American Transmission*, 216 Mich App at 121. If an appellant does not assert adequate support for her position, she has abandoned it on appeal. See *McIntosh v McIntosh*, 282 Mich App 471, 485; 768 NW2d 325 (2008). Accordingly, defendant has abandoned this claim by failing to provide a legal or factual basis that supports it.

## E. SOCIAL SECURITY NUMBER PRIVACY ACT

Defendant argues that the trial court erred by granting plaintiff's motion for partial summary disposition pursuant to MCR 2.116(C)(8) with respect to her counterclaim alleging violation of the Social Security Number Privacy Act (SSNPA), MCL 445.81 *et seq*. She also contends that the trial court erred by denying her motion for reconsideration regarding this counterclaim. We disagree.

We review de novo the trial court's ruling on a motion for summary disposition. *Maiden*, 461 Mich at 118. A party is entitled to summary disposition under MCR 2.116(C)(8) if the opposing party fails to state a claim on which relief can be granted. "A motion for summary disposition under MCR 2.116(C)(8) tests the legal sufficiency of a claim by the pleadings alone." *Taylor v Kurapati*, 236 Mich App 315, 359; 600 NW2d 670 (1999), quoting *Jackson v Oliver*, 204 Mich App 122, 125; 514 NW2d 195 (1994). The trial court must accept all factual allegations pleaded in the complaint as true, and it may only grant summary disposition if "no factual development could possibly justify a right of recovery." *Id*.

The SSNPA provides that a person shall not intentionally "include all or more than 4 sequential digits of the social security number in any document or information mailed to a person," unless an exception applies. MCL 445.83(1)(g). One exception applies to the "use of all or more than 4 sequential digits of a social security number that is authorized or required by state or federal statute, rule, or regulation, by court order or rule, or *pursuant to legal discovery*

---

[7] Defendant cites only to *McDonald v Asset Acceptance LLC*, unpublished opinion of the United States District Court for the Eastern District of Michigan, issued August 7, 2013 (Case No. 2:11-cv-13080), which applied Ohio and Delaware law and was later vacated.

*or process*." MCL 445.83(2)(a) (emphasis added). Prior to initiating suit for violation of the SSNPA, the act requires that,

> [e]xcept for good cause, not later than 60 days before filing a civil action, an individual must make a written demand to the person for a violation of section 3 for the amount of his or her actual damages with reasonable documentation of the violation and the actual damages caused by the violation. [MCL 445.86(2).]

Defendant's counterclaim alleged that plaintiff violated the SSNPA when, during the course of the Wilson litigation, it transmitted to counsel for Wilson Motorsports copies of defendant's loan application and credit reports containing her unredacted Social Security number. The trial court dismissed this counterclaim because defendant had failed to plead that she made a written prelitigation demand and because and transmittal of her Social Security number fell within the statute's discovery exception.

On appeal, defendant contends that the trial court erred in dismissing her counterclaim because the documents at issue – her loan application and credit reports – were not relevant to the Wilson litigation.[8] But plaintiff cites no authority for the proposition that a document's relevance is determinative of whether the discovery exception applies. The exception simply provides that the SSNPA regulations do not apply when transmittal of an individual's Social Security number occurred pursuant to legal discovery, as was the case here. Nonetheless, the documents at issue were relevant under Michigan's " 'open, broad discovery policy that permits liberal discovery of any matter, not privileged, that is relevant to the subject matter involved in the pending case.' " See *Augustine v Allstate Ins Co*, 292 Mich App 408, 419; 807 NW2d 77 (2011), quoting *Reed Dairy Farm v Consumers Power Co*, 227 Mich App 614, 618; 576 NW2d 709 (1998). Evidence is relevant if it is offered to prove or disprove a matter of consequence to the case. MRE 401; *Morales*, 279 Mich App at 731. Because the Wilson litigation concerned plaintiff's property interest in and right to recover the boat from Wilson Motorsports, the loan documents demonstrating that property interest were decidedly relevant to that litigation. Further, any loan documents regarding a previous loan between defendant and Wirt Financial Services, Inc.,[9] were relevant because, as part of its subsequent loan agreement with defendant,

---

[8] Defendant also argues that plaintiff's motion for partial summary disposition with respect to this claim was procedurally defective because plaintiff failed to raise the discovery exception as an affirmative defense in its answer to defendant's counterclaim. We reject this argument because defendant pleaded generally in its answer that defendant failed to state a claim upon which relief may be granted. Further, MCR 2.111(F)(2) provides, "A defense not asserted in the responsive pleading or by motion as provided by these rules is waived, *except for the defenses of . . . failure to state a claim on which relief can be granted*." (Emphasis added). Accordingly, plaintiff was under no obligation to plead the specific bases on which it intended to seek dismissal pursuant to MCR 2.116(C)(8).

[9] Wirt Financial Services, Inc., a nonparty to the present action, extended a loan to defendant and Mr. Geiling in July 2007. Plaintiff paid off the balance of this loan when, in September 2008, it executed with defendant the $60,000 loan secured by the boat. During the course of the Wilson

-20-

plaintiff paid off the balance on the Wirt Financial loan. Thus, the trial court did not err by holding that because the discovery exception applied, defendant's counterclaim was subject to dismissal.

Because we hold that the trial court properly determined that defendant failed to state a claim on the ground of the discovery exception, it is unnecessary to address the trial court's alternative conclusion that defendant failed to make a written demand as required by the statute. Additionally, to the extent that defendant argues that public policy should prevent plaintiff from disseminating her Social Security number in a case in which defendant is not a party, we decline to create such a policy. Generally, the boundaries of public policy are defined by "the policies that, in fact, have been adopted by the public through our various legal processes, and are reflected in our state and federal constitutions, our statues, and the common law." *Terrien v Zwit*, 467 Mich 56, 66-67; 648 NW2d 602 (2002). Defendant identifies no existing public policies in support of her position, and the language of the SSNPA does not itself require that the legal discovery occur in an action in which the allegedly harmed individual is a party. See MCL 445.83(2)(a).

Finally, insofar as defendant contends on appeal that the trial court erred by dismissing her counterclaim without compelling plaintiff's compliance with discovery requests, we conclude that this argument is without merit. The trial court dismissed the counterclaim on the pleadings pursuant to MCR 2.116(C)(8) and not on the basis of the evidence. Accordingly, we determine that the trial court properly dismissed Count IV of defendant's counterclaim.

We affirm.

/s/ Michael F. Gadola
/s/ Kirsten Frank Kelly
/s/ Michael J. Riordan

---

litigation, Wirt Financial, which was also a nonparty to that case, responded to a subpoena by providing defendant's and Mr. Geiling's unredacted credit reports connected with the 2007 loan.